HENRY L. HOTCHKISS, TRUSTEE, & OTHERS *vs.* THE BRAINERD QUARRY COMPANY & OTHERS.

New Haven Co., June T., 1889. ANDREWS, C. J., CARPENTER, PARDEE, LOOMIS and BEARDSLEY, Js.

A partner in a quarry company, who owned a one eighth interest, died in 1857, leaving by his will to his wife one third of his personal property absolutely, and one third of his real estate for life, and the rest of his property to trustees for his minor daughter. By the terms of the partnership it was to be controlled by a majority in interest and was to continue until such a majority should request its dissolution. A dissolution not being desired the property of the widow and daughter remained in the business, and the partnership continued until 1883, when a corporation was formed, all the partners taking stock in the proportion in which they held interests in the partnership. The widow and daughter became entitled to and accepted four hundred shares in the aggregate, but disagreed as to their respective rights in them. The property given them by the will and which had gone into the partnership was appraised at the time, the personal at $6,000, and the real at $19,000. The partnership had in the prosecution of its business used up most or all of the personal property and replaced it with other, and had exhausted some of the quarry land and purchased other, and no separate account had been kept of income as distinguished from principal, and earnings had been used in the purchase of lands and personal property used in the business. The business had greatly increased and a large surplus had been allowed to accumulate, which went into the capital of the corporation. Held that the proportionate interests of the widow and daughter in the property which was allowed to remain in the partnership after 1857 were not changed by the varying quantities of personal and real estate held by the partnership at different times, nor by the quantity of each at the time that the corporation took the place of the partnership, and that the stock in the corporation which represented their joint interest was to be ap-

portioned between them according to their relative interests in the property in 1857.

The widow was not entitled to a full share of the increase in the value of the property as representing profits, nor to any part of the earnings which the managing parties decided not to distribute in dividends but to preserve as a surplus.

The power given by the partnership articles to a majority in interest to manage the business of the partnership and to declare dividends at its discretion, necessarily involved the power to capitalize profits instead of dividing them.

And the widow, by agreeing with all the other partners that the entire property of the partnership should go into the corporation at a certain sum and constitute its capital, agreed, so far as that sum embraced profits, that profits should be capitalized.

[Argued June 5th—decided October 30th, 1889.]

SUIT by Henry L. Hotchkiss, as trustee of certain property for Mary W. Burrows, and by the said Mary, and her husband Silas E. Burrows, against the Brainerd Quarry Company, a corporation, and Eliza T. White and her husband Josiah J. White, for an adjudication of the respective rights of the said Mary W. Burrows and the said Eliza T. White in certain shares of the stock of the corporation, for an accounting and for an injunction; brought to the Superior Court in New Haven County, and heard before *Fenn, J.* Facts found and a decree passed dividing the stock in a certain proportion between the parties, and appeal by both plaintiffs and defendants. The case is fully stated in the opinion.

*S. E. Baldwin* and *J. T. Platt,* for the defendants.

1. The distribution gave Mrs. Burrows no absolute interest except in certain specific articles of personal property, described in the will of Mr. Hall as belonging to him at his decease. All this personal property disappeared from existence long before the corporation was organized to succeed the partnership, and with it her right in the personal property of the firm ceased to exist.

2. Her title did not spread over any after-acquired personal property. It is of no consequence to her whether the firm bought new cattle or tools, quarried more stone, or

made further sales on credit or for cash, except so far as these things resulted in dividends to her. It is not like the case of a railroad or mill mortgage, where certain kinds of property are necessary to the land, or fixtures, and go with the security as an incident. Here her title to the personal assets was the principal thing.

3. She had no interest in partnership assets as such. At her husband's death she was not of age and was incapable of assuming the relation of a partner, and if she had been she had no power to vary the rights of Mrs. White, the daughter of Mr. Hall and his heir. It was Mr. Hall's estate that remained in the partnership, represented by his executor. Mrs. Burrows was simply a co-tenant of certain chattels and choses in action. " An infant may reclaim his share of the firm's property at any time, on his title as co-tenant, irrespective of the state of account between himself and his co-partners." Parsons's Principles of Partnership, § 137. No interest in the partnership was inventoried or distributed. This was strictly in accordance with law. The real estate of Mr. Hall, used by the firm, would have been treated as partnership property in equity, as against the widow or heirs in favor of creditors, if necessary for their protection. But, creditors not intervening, it remained his real estate. *Wilcox* v. *Wilcox*, 13 Allen, 252; *Foster's Appeal*, 74 Penn. St., 391; *Wheatly* v. *Calhoun*, 12 Leigh, 264. Unlike personal property or ordinary real estate owned in severalty, it was here inseparable from the partnership so long as the latter endured. The partnership articles expressly provided for this. *Frink* v. *Branch*, 16 Conn., 260, 269. And on general principles a quarrying or mining partnership is never dissolved by the death of a partner. *Fereday* v. *Wightwick*, 1 Russ. & Mylne, 49; *Skillman* v. *Lachman*, 23 Cal., 198; *Kuhn* v. *Smelting Co.*, 102 U. S. R., 641; *Bissell* v. *Foss*, 114 id., 252. This contract of partnership therefore, as well as the principles controlling mining partnerships, left the whole of Mr. Hall's estate at risk, after his death, for the partnership debts thereafter incurred. *Blodgett* v. *Am. Nat. Bank*, 49 Conn., 9. This rested the burden

on his executors, who, as acting partners, shared the risk personally with Mrs. White, whose property was left at hazard. *Frazer* v. *Murdock*, L. R., 6 App. Cas., 855; Parsons's Principles of Partnership, § 74.

· 4. Mrs. Burrows had no interest in undivided partnership profits. The matter of declaring dividends was by the partnership articles left to the managing majority. *Duffield* v. *Brainerd*, 45 Conn., 424; *Straker* v. *Wilson*, L. R., 6 Cha. App., 503.

5. She had no interest in new purchases of land. If the managing majority chose to invest profits in buying more land instead of making dividends, they had a right to do so, both by the partnership articles and by the nature of a quarrying industry, which requires the purchase of new land to replace that which is exhausted. *Balch* v. *Hallett*, 10 Gray, 402. It appears that the partnership spent $170,000 in buying new lands after Mr. Hall died. Under the English rule this land might have become personal property for partnership purposes, but the American rule treats it as real estate of the respective partners for all purposes of descent and grant, if not needed for strict partnership purposes. *Fairchild* v. *Fairchild*, 64 N. York, 471.

6. When the corporation was formed, and the entire property of the partnership was with Mrs. Burrows's consent put into the 3200 shares of stock, all equities between the partners were merged in the charter. *Hoyt* v. *Sprague*, 103 U. S. R., 613 ; *Francklyn* v. *Sprague*, 121 id., 215. None of the shares could be considered as representing income in which a life tenant could share. *Brown & Larned's Petition*, 14 R. Isl., 371. The profits undistributed had become a part of the capital of the corporation. The majority in interest, by the partnership articles, and on general principles, had power thus to capitalize the surplus. *In re Barton's Trust*, L. R., 5 Eq., 238.

*H. Stoddard* and *J. W. Bristol*, for the plaintiffs.

1. Mrs. Burrows, by virtue of her life estate, is entitled absolutely to her share in all the earnings and products of

the quarries during her life. By the partnership agreement the quarries were to be worked and the proceeds divided in the proportion of one third to her and two thirds to Mrs. White. The life tenant of such quarries has a right to work them to exhaustion, and take absolutely the proceeds. The authorities to this effect are believed to be uniform. 1 Washb. R. Prop., book 1., ch. 5, § 4. art. 18; Id., book 1, ch. 7, § 2, art. 21; *Billings* v. *Taylor*, 10 Pick., 460; *Coates* v. *Cheever*, 1 Cowen, 460; *Moore* v. *Rollins*, 45 Maine, 493; *Neel* v. *Neel*, 19 Penn. St., 323; *Irwin* v. *Covode*, 24 id., 162; *Westmoreland Coal Co.'s Appeal*, 85 id., 344; *Shoemaker's Appeal*, 106 id., 392; *Sayers* v. *Hoskinson*, 110 id., 473; *Stoughton* v. *Leigh*, 1 Taunt., 402; *Clegg* v. *Rowland*, L. R., 2 Eq., 160; 1 Morawitz on Corp., § 442. The real estate having been given to Mrs. Burrows in lieu of dower, and being quarry land, of no value but for quarrying, and at the time in process of being worked, it is evident that the testator intended that she should during her life have all the benefit from working the quarries to their largest limit. It makes no difference that some of the proceeds of the business were invested in new lands. As between these two parties these lands will be treated in equity as money, as they were purchased with funds that belonged absolutely to Mrs. Burrows as life tenant. Nor can the fact that the partnership was unable to collect all the proceeds of the business before the dissolution deprive her of her absolute interest in those proceeds. Upon the dissolution of the partnership in 1883 it became necessary that there should be a distribution of the assets as upon a final settlement of the partnership affairs. The partnership agreement controls as to the division of the profits during the continuance of the partnership, but does not affect the distribution of the property upon the winding up of the partnership. *Duffield* v. *Brainerd*, 45 Conn., 424.

2. Neither Mrs. Burrows nor Mrs. White gained or lost any existing rights by consenting to the formation of the corporation. The former consented to the dissolution of the partnership and the formation of the corporation with

presumed knowledge of the law as declared in *Duffield* v. *Brainerd*, that she had a right to demand the dissolution and thereupon take her share of the property. The case finds that she never intentionally waived any right. Besides, by the charter of the corporation each partner was to be allowed such a number of shares as would make his interest in the corporation "proportionate to his interest in said firm either as co-partner or as equitable owner in undivided profits." Private Laws of 1879, p. 35. Clearly here was no waiver of rights in undivided profits. It does not affect the case that there was a valuation of the property for the purposes of incorporation at $320,000; there was none the less a fund representing undivided earnings that went into that sum, to which Mrs. Burrows was entitled absolutely, and consequently to the number of shares representing it.

3. The controlling partners had no power to capitalize profits in such a way as to affect the relative interests of life tenants and remainder-men. Mrs. Burrows's rights were determined by the will of Mr. Hall. By that will she was entitled absolutely to the earnings of the property in which she had a life interest. It is unlike the case of capitalization of profits where there are no such interests. There all parties in interest share alike in both profits divided and in those retained as a surplus. But the retention of profits as a surplus while the partnership continued is wholly another thing from the capitalization of that surplus by turning it into a part of the capital stock of a corporation. The rights of Mrs. Burrows were the rights of a partner on the winding up of the partnership. It is at that point that her rights are to be considered. So far as she may be taken to have assented to the formation of the corporation, it was only putting into it what she would have been entitled to on the winding up of the partnership. It is no matter that a part of it was undivided surplus. It went in as her absolute property, and she was entitled absolutely to all the stock which represented it. This is especially so since it is found that for ten years from 1871 to 1881 there was no division

of profits because they were necessarily expended on the New York and Brooklyn property, as to which the finding is that this property was taken through necessity and was regarded as collateral security for the debts it represented, and "has never been intended for or treated as permanent investments" but that it has been "the constant policy and desire of the firm to sell it and divide the proceeds."

4. It is claimed on the part of Mrs. White that the personal property given by the will to Mrs. Burrows was specific property, which was used up in business and had ceased to exist, and that she had no interest in the property bought to replace it.   Of course the answer to this claim is that both Mrs. Burrows and Mrs. White took by the will of Mr. Hall, and by the distribution under that will, an undivided interest in a common mass of personal property used in working the quarries, and that all additions to such common stock purchased by the product of the quarries and made part of such personal property, and used in common to work the quarries, necessarily belong to these common owners and partners in the proportion in which their respective interests have been appropriated to such purchase and addition.   But these new purchases and additions made to replace the articles so used up, were purchased by the use of moneys that belonged to Mrs. Burrows, and being so purchased with her money, or with money that otherwise would have been distributed to her, she of course still owns her proportionate interest and share therein absolutely.*

CARPENTER, J.   Frederick Hall died in 1857, the owner of two sixteenths of the property of the Brainerds Quarry Company, a co-partnership in the business of quarrying stone.   His death did not dissolve the partnership.   His widow, now Mrs. Burrows, under his will took one third of his personal property in fee, and one third of his real estate for life.   His daughter, now Mrs. White, took beneficially the rest of his estate.   The co-partnership continued by the

* Other points were made upon both sides, but as the court does not consider them they are omitted.

consent of Hall's executors, his widow and daughter, until December 31st, 1883.

Hall's interest in the quarry business was appraised—the personal estate at $6,000, and the real estate at $19,000. In the distribution there was set to the widow in fee an undivided interest in the personalty, valued at $2,000, and a life use in one third of the realty, undivided, valued at $6,333.33. Dividends of profits were made annually until 1871. From 1871 to 1881 no dividends were made. On the 31st of December, 1883, a corporation succeeded the partnership, the property being valued, a low estimate, at $320,000. The interest of Mr. Hall's estate was valued at $40,000. Those interested became stockholders in proportion to the value of their respective interests in the partnership. Mrs. Burrows and Mrs. White could not agree upon a division of the stock. This suit was brought to settle the matter. They together were entitled to four hundred shares. The Superior Court gave to Mrs. White two hundred and sixty-six and two thirds shares in fee. That is not complained of. It then gave to Mrs. Burrows thirty-two shares in fee, representing her interest in the personal property. Of this Mrs. White in her appeal complains. It then gave one hundred and one and one third shares to Mrs. Burrows for life, with remainder to Mrs. White. Of this Mrs. Burrows in her appeal complains.

Mrs. White claims on the one hand that the personal property which was distributed to Mrs. Burrows had been exhausted, so that she was entitled to no stock absolutely. Mrs. Burrows on the other hand claims that the stock representing the increase of the realty represents earnings or profits, and that she is entitled to that in fee.

We will first consider Mrs. Burrows's claim. She assumes, and her counsel base their argument on that assumption, that the whole increase is accumulated earnings. Is this assumption warranted by the facts? For the fact must appear, expressly or by implication. Otherwise no error is apparent. It will be conceded that it does not appear in terms. If it appears by implication, it must be a necessary

implication.   If the evidential facts will warrant any other inference then we can find no error unless we first decide a question of fact; and that under our law we are not permitted to do.

Stating the question then in another form—does it appear from the record that the increase in the value of the partnership property is due to profits?

Now these facts do appear: That from 1857 to 1883 there were paid in dividends $720,000; that during that time the company paid from the earnings about $148,000 for land essential to the business; and that it paid more than $300,000 to protect the New York and Brooklyn property taken as security for stone sold.   Probably some portion of the earnings was also applied in purchasing necessary personal property.   The net increase of the plant was $120,000.   How much of that was real and how much personal property we know not, nor is it of great importance; but assuming that both increased in essentially the same proportion, as seems probable and which we may assume in the absence of anything in the finding to the contrary, the personalty increased $26,800, and the realty $93,200.   Now we are not warranted in assuming that the expenditure of $148,000 for land of itself increased the value of the plant $93,200; because the finding is—" which lands were purchased because necessary, either immediately or remotely, for the business of the company as a continuing quarrying business."   That would seem to imply that the amount thus expended was mainly required to supply the loss arising from the exhausting nature of the business.   Nevertheless, perhaps in fairness we ought to assume that the lands purchased did something more than repair the loss; that in fact they added something to the value of the plant.

But there is another factor that cannot in justice be overlooked.   The court below says: "But I further find that in the prosecution of said trade or business of quarrying, from the death of Frederick Hall to the formation of the defendant corporation, the volume of business, though with fluctuations, *largely increased.*"   In addition to that it must

also be borne in mind that there was a marked appreciation of all kinds of property, especially real estate, after 1861; that in 1857 the business of the country was very much depressed; and that the inflation of the currency during the war, which continued for many years after, increased values and stimulated and extended business largely, especially those departments of business that would more particularly benefit the quarrying business. These are matters of common knowledge. It is true that for the decade following 1873 there was a considerable falling off of business; nevertheless the net result must have been that there was an appreciation of values to a considerable amount aside from the increase arising directly from the increase of property. The court below has not told us how much of the increase is owing to each of these two causes, and has given us no data by which we can ascertain. While it is probable that it is due in some measure to both, yet it is legally possible that it is wholly due to one of them. If so, to which one? The court has not told us. If to both, in what proportions? Again we are left in ignorance. Before we can find error we must know that some portion of the stock represents income to which Mrs. Burrows is entitled. In this state of the record it is difficult for us to say that the third and fourth reasons of appeal, which are in substance that Mrs. Burrows is entitled to more stock absolutely than the court awarded her, are sustained.

It may be suggested that the court erred in not finding definitely to what source the accretion was due, and, if to both, in what proportion to each. The difficulty is that it does not appear that the court was asked to do so, and no such error is pointed out in the reasons of appeal. The court was asked to find the value of the book debts and bills receivable of the company at the time the corporation was formed; but that is very different from the precise question we are now considering.

But aside from these difficulties, which are somewhat superficial, we think the case must turn upon other considerations, which lie deeper and touch the very vitals of the

case. When Hall died, substantially all his property was invested in the quarrying business. The quarry interest distributed to his widow was in common with others and not in severalty. She might have called for a division— that is she might have declined to continue in the partner-ship. In that event her portion would have been assigned to her in specific articles of property or its equivalent paid to her in cash. Her income would then have been whatever she could have obtained from about $8,000, or say $500 an-nually in round numbers. Instead of doing that however she elected to continue her interest in the business. That she acted wisely is abundantly proved; for she has not only received a net income of $30,000 in twenty-six years, but she has an interest in a large amount of property valued at $75,000, which when converted into cash will be distributed as profits; and she also has the principal, not as she received it, but improved in value, and its income-earning capacity largely increased. She could have made nothing but loss had she terminated the partnership; and it is very clear that the bare right to terminate the partnership can give her no advantage now.

The interest of Mrs. White in the estate is equally for-tunate. Thus far neither is benefited at the expense of the other. Each was interested in the same enterprise, and what benefited one benefited the other. But coming to the point of issuing stock, their interests diverge, and each claims what the other is unwilling to concede. Mrs. Bur-rows claims that the real estate in which she has a life estate is entitled to its proportion of the increase, and that that in-crease is profits to which she is entitled absolutely. Thus, that interest was valued at $6,333.33. Sixty per cent. of that is $3,800, just the amount which she claims.

We have already attempted to show that her claim cannot be sustained so far as the increase is owing to a rise in values. We will now consider whether it can be sustained in respect to any undivided profits—profits which will never be divided and paid out as profits.

We will consider this question in a threefold aspect:—

1st, her rights as a partner; 2d, her rights as a stockholder; and 3d, her rights under the will.

As a partner her rights are determined by the partnership articles. We quote:—

"*Article Third.* All dividends of the rents and profits arising and accruing from the said co-partnership business, and all debts and liabilities contracted for and in the said co-partnership name, as is mentioned and more fully specified in article second of this agreement, shall be divided among the co-partners in the following proportions * * *.

"*Article Fourth.* A majority of ownership, as hereinbefore mentioned in article third of this agreement, of the interests of the respective partners in said co-partnership, shall bind, control and manage the business affairs of said co-partnership, and all credits, sales, purchases, hire and wages of workmen, overseers and agents, which may be deemed for the benefit and advantage of said co-partnership, shall be so made whenever the majority of interests aforesaid shall request and demand, and not otherwise.

"*Article Fifth.* No partner or partners of said co-partnership shall at any time use or draw from the funds of said co-partnership an amount of money greater than may be due or owing by said partnership to said partner for services, salary or dividends remaining unpaid, standing to the credit of said partners upon the books of said co-partnership, except as herein mentioned and more fully set forth in article second of this agreement."

Under this agreement it is perfectly clear that she was entitled to share in severalty only in the declared dividends. Her dividends alone belonged to her. Undivided earnings belonged to the partnership. So long as the partnership continued that was the extent of her rights. In the absence of fraud or bad faith she had no power to compel a division of profits. It does not help the matter to say that she might have terminated the partnership at any time and thus have compelled a division, for the simple reason that she did not do it. It is the termination of the partnership which requires a division, and not the existence of a right to ter-

minate it. For obvious reasons she chose to continue it; and doing so, her rights are measured and limited by the articles of agreement. It is absurd to claim that she may receive the benefits of the partnership, and in addition thereto such other benefits as a distribution would have given her. Two courses were open to her; she could take one, but not both. She had her choice, and by that she must abide.

As a stockholder her rights are determined by the charter and the law. But the question here is not exactly that; but what is her interest in the stock to which she is entitled? Is it a fee, or a life estate? The obvious answer is that she has the same rights as a stockholder that she had as a partner, unless the charter or some agreement, express or implied, of the parties in interest, has given her some right she did not have before, or deprived her of some right which she did have.

That portion of the charter which bears upon this question is found in 8 Special Laws, p. 243, sec. 2. The material part of it is as follows:—" The capital stock of said corporation shall be three hundred and twenty thousand dollars, * * * and when the books of subscription for the capital stock of said corporation shall be opened, each of the parties in interest in the quarry firm of Brainerd & Company, of Portland, Connecticut, shall have notice of the time and place thereof, and shall have the privilege, at any time within sixty days, of subscribing for and taking such a number of shares as will make his interest in the corporation proportionate to his interest in the said firm, either as co-partner or equitable owner in undivided profits : " etc.

Clearly no intention can be discovered here to change or vary the interest or right of any of the parties in interest as between themselves, if indeed the legislature had any power to do so. On the contrary, the intention is manifest that each party should have the same interest under the corporation that he or she had in the partnership, the change being merely in the form of transacting business.

It must be remembered that only Mrs. Burrows and Mrs.

White are interested in this question, and every presumption is against the supposition that the legislature intended to change their respective rights and obligations as to each other.   If therefore Mrs. Burrows had no right to a portion of the undivided profits in fee under the partnership, we think it is clear that she acquired no such right under the charter.

Has there been any agreement in writing or otherwise affecting the interest of either of these parties?   They have made no agreement by which their respective interests have been determined.   The only writings they or either of them have signed have relation only to changing the partnership into a corporation, and they must be interpreted with reference to that object, and will not be construed as having a collateral effect not expressly provided for.   In 1863 the partners appointed a committee to consider the propriety of organizing a corporation under a special charter; in 1879 a charter was granted; in 1882 the partners voted "that each member of the firm of Brainerd & Co., or the persons representing the several interests in the company, be required to sign a deed conveying all their right, title and interest in all the property, personal, real and mixed, of every description, belonging to the said Brainerd & Co., and receive in lieu thereof certificates of the capital stock of the new company for such a number of shares as will make his or her interest in the new company proportionate to his or her interest in the present firm of Brainerd & Co."

In the agreement to subscribe for stock is the following:— "And each of the parties so subscribing agrees with said corporation, said agreement being several and not joint, to take the number of shares of said capital stock set opposite the name of such party, and to pay therefor by conveying or causing to be conveyed to said corporation in due form of law, on demand, such an undivided portion of the real or personal estate of the late quarry firm of Brainerd & Company as will make the proportion thereof equivalent to the proportional number of shares of said capital stock subscribed by such party."

At a stockholders' meeting subsequently held it was voted—" that the subscribers to such stock may pay for the same by conveying to such corporation their interests respectively in such property and estate of said firm of Brainerd & Co., provided such interests are estimated and valued on the basis of said appraisal."

In the joint deed signed by Mrs. White she relinquished no beneficial interest, and by the deed signed by Mrs. Burrows and her trustee, she certainly acquired no interest that she did not have before.

In all these proceedings we discover a studied intention that each partner should enter the corporation with the same interest that he or she had in the co-partnership. The partners as such had no power, consequently will be presumed to have had no intention, to change the relative interests of Mrs. Burrows and Mrs. White.

It does not seem to us that the will materially affects the question one way or the other. For Mrs. Burrows it is contended that the words of the devise,—" I also give, devise and bequeath to my said wife one third part of all the real estate which shall belong to me at the time of my decease, to have and to hold for and during the term of her natural life," operate not only to give her the annual dividends, but also a portion of the undivided profits, whatever other disposition may have been made of them by the management. The language will not justify this claim. It imports nothing more than that she is to have an ordinary life estate. There is no attempt to decide as to what shall be regarded as profits, and no provision that she shall share in such earnings as may be needed and used to continue and maintain the business. That is left for the law to determine. In determining it the law will regard not only the language used, but also the nature and situation of the property, the circumstances and condition of the widow, etc.

A large portion of the testator's property was invested in the quarry business. All the real estate was so invested. He could not have supposed, and therefore could not have intended, that the widow would take her one third of his

interest, being one twenty-fourth of the whole, and, separated from other interests, work it on her own account.   Such a course would have been practically impossible, or, if possible, certainly ruinous.   The only way in which it could be available, at least the best way, was to continue the business as before.   This he well knew.   He also knew what the agreement was, the nature of the property, its liability to exhaustion by use, the necessity for purchasing other property to keep the quarry in productive condition, etc.   Therefore, when he gave her a life-use he intended that such portions of the earnings as might be necessary should be used to keep the quarry in a condition to yield an income.   To suppose otherwise is to suppose that he contemplated that not only her income might cease, but also that the property itself might be rendered worthless.   No one can doubt that the course actually taken was the best, not only for the life-estate but also for the reversion.   It simply continued the business as it had been conducted before under his own administration; and therefore he must have intended it.   So far as we can judge the will operates quite as much against as for her claim.

In the plaintiff's brief we are repeatedly told that this is simply a case of winding up a partnership, and on that assumption the argument mainly rests.   Let us not deceive or mislead ourselves by confounding things that differ.   Arguments drawn from supposed facts which have no existence, like reasoning from false premises, can lead to no satisfactory conclusion.   The dissolution of a partnership, with a distribution of the assets, is one thing; the conversion of a partnership into a corporation for the purpose of continuing the business by the corporation is quite another.   There is one feature common to both—the discontinuance of the partnership.   That feature on which the argument depends—the distribution of the assets—exists in the one case and is wanting in the other.   As it is wanting in this case the argument has no application.

The plaintiffs attempt to distinguish this case from some of the cases cited, claiming in substance that the company

had no power to capitalize profits ; virtually conceding that
if it had that power the action of the company is binding
on all concerned.    That it had such power seems to us hardly
to admit of a question.    When Mrs. Burrows elected to
continue her interest in the partnership, she did so with
knowledge of the co-partnership articles and of the nature
and necessities of the business.    She thereby agreed that a
majority in interest might manage the business as it saw fit;
might make such dividends as it pleased, and use profits if
it deemed it best in improving the property.    That necessity
included the power, if the business required it, to capitalize
profits.    Added to this is the fact that the management act-
ually exercised the power with the knowledge and by the
consent of all the parties in interest, for more than a quarter
of a century—a practical construction which amounts to
strong if not conclusive proof of the existence of authority
to do so.

Nor is this all.    When all the partners, including Mrs. Bur-
rows, agreed, for the purpose of forming the corporation,
that the property should be valued at $320,000, they agreed,
so far as that sum embraced profits, that profits should be
capitalized.    If any doubt still remains, we say further, that
when the legislature authorized the formation of a corporation
on that basis, and every partner accepted that act and took
his or her proportion of the stock, it put an end to all con-
troversy.    They then had legislative authority to capitalize
profits, and they actually did it.

It is hardly necessary to cite cases in support of the propo-
sition that such action is binding; it is like citing cases to
prove that one is bound by his own acts.

In this the partners acted for and by themselves, and not
through an agency.    So far as such acts are concerned it is
not a question of authority to agents, but whether their own
acts are binding.    Surely on that question no argument or
authority is necessary.

That the act of a corporation, or of a partnership when
duly authorized, in capitalizing profits, is binding upon all
concerned, in England seems to be well established.

In *Straker* v. *Wilson*, L. R., 6 Ch. App., 503, the head note is as follows :—" A testator gave to his wife a life interest in his one seventh of a colliery in which he was a partner.   By the deed of partnership the majority in value of the partners had power to dispose of the profits by adding them to the capital or dividing them between the partners or carrying them to the separate accounts of the partners.   For several years profits were made, but retained to the credit of a profit and loss account.   Afterwards profits were divided, but at the death of the tenant for life a large sum remained to the credit of the profit and loss account, a greater part of which had been sunk in the works of the colliery.   Held that, under the circumstances, the share of the testator in the sum standing to the credit of the profit and loss account belonged to the person entitled in remainder, and not to the executor of the tenant for life."

*In re Barton's Trust*, L. R., 5 Eq. Cases, 238, was as follows:—During A's lifetime (a life tenant,) an addition of three new fully paid up shares to those already held in trust for her was made, pursuant to a resolution passed at a general meeting of the company to apply a portion of the net earnings during the half year to necessary works, and issue new shares to represent the money so applied, a dividend being declared out of the remaining portion of the earnings. It was held that these new shares were capital, and not income, as between the tenant for life and those entitled in remainder.   Sir W. Payne Wood, V. C., says:—" The dividend to which a tenant for life is entitled is the dividend which the company chooses to declare.   And when the company meet and say that they will not declare a dividend, but will carry over some portion of the half year's earnings to the capital account, and turn it into capital, it is competent for them, I apprehend, to do so; and when this is done everybody is bound by it, and the tenant for life of those shares cannot complain."

In *Sproule* v. *Bouch*, L. R., 29 Ch. Div., 635, Fry, L. J., says on page 653 : " When a testator or settlor directs or permits the subject of his disposition to remain as shares

or stock in a company which has the power either of dis-
tributing its profits as dividends or of converting them
into capital, and the company validly exercises this power,
such exercise of its power is binding on all persons inter-
ested under him, the testator or settlor, in the shares, and
consequently what is paid by the company as dividend goes
to the tenant for life, and what is paid by the company to
the shareholder as capital, or appropriated as an increase of
the capital stock in the concern, enures to the benefit of all
who are interested in the capital. In a word, what the
company says is income, shall be income, and what it says
is capital, shall be capital."

This case was appealed to the House of Lords and Privy
Council, 12 Appeal Cases, 385. On page 397 Lord HER-
SCHELL quotes the above language of Lord Justice FRY with
approval.

We come now to consider briefly Mrs. White's appeal.
It is contended that Mrs. Burrows is entitled to no stock in
fee on account of the personal property. The argument is
that the distribution gave the widow no absolute interest ex-
cept in certain specific articles; that all these items of per-
sonal property disappeared from existence long before the
corporation was organized to succeed the firm; that she re-
ceived more than an equivalent in dividends; and that she
has no interest in after-acquired personal property, etc.
The foundation of the whole argument is in the assumption
that there was distributed to the widow an interest in certain
specified articles of personal property, and not an interest in
the partnership.

We do not so interpret the record. The will gave to the
widow one third of the personal property in fee, and a life
estate in one third of the real estate. The testator's in-
terest in the quarry company constituted all of his real
estate. That, and his interest in the personal property used
in the quarry business, were appraised separately. His
interest in each was a fractional part, one eighth of the
whole. The distribution, following the appraisal, set to the
widow "the one undivided third of the one eighth of the

Brainerd & Co. quarry, and the undivided third of the one eighth of the personal estate in the Brainerd quarry." It seems to us that they gave her no interest in specific articles, but a fractional interest of a fractional interest in the whole property. The separation of the personal estate from the real in the quarry business seems to have been regarded as necessary in order to comply with the provisions of the will and give the widow a life estate only in the real estate. Had they called it all real estate Mrs. Burrows would have complained; had they called it all personal property Mrs. White would have felt aggrieved. For the purpose of settling the estate they made a separation, and both parties seem to have been satisfied. The fact that they avoided a division of the assets of the partnership among the partners, and gave to the widow and the daughter undivided interests in the whole, clearly indicates that it was intended that each should take an interest in the partnership as such. Indeed it is hardly possible to put any other rational construction upon the transaction. Counsel say that it was the estate of Frederick Hall that remained in the partnership. And who are the parties beneficially interested in the estate? No one but Mrs. White and Mrs. Burrows. They therefore are the parties beneficially interested in the partnership, and are the real partners as to one eighth of the whole. Mrs. White may be excluded for the benefit of Mrs. Burrows with the same propriety that Mrs. Burrows may be excluded for the benefit of Mrs. White. Neither can be excluded. After the distribution therefore, as before, these two parties were and continued to be partners. Each had an interest in the partnership property so long as the partnership continued; and that interest was measured by the terms of the will. Each had an interest in the earnings of the partnership measured by the same rule, although qualified as to the time of enjoyment by the articles of co-partnership. When they went into the corporation they carried unimpaired their respective interests, which each now retains.

That this is a correct view is apparent we think from the nature of the partnership. Partnerships for quarrying stone,

like mining partnerships, require more permanence, and the law allows it. Moreover the parties themselves provided for it in the provision that the partnership should continue so long as a majority in interest desired it. As a consequence of this, counsel for Mrs. White contend, as to the real estate, that it was not in the power of the widow or heirs to take it out of the hands of the partnership without the consent of a majority in interest of the partners; that the estate in the lands was inseparable from the partnership so long as it endured. To withdraw it would have broken up the partnership. If this is true of the real estate, it is equally true of the personal property. The latter was just as essential to the purposes of the partnership as the former. Whether counsel are right or wrong in this is not now material; for, if they had the power to dissolve and wind up the partnership, it is certain that they never exercised it. They, in common with the other partners, chose to continue it, and they did so. In substance it continues now, although in a little different form; for a quarry partnership, and especially this one, is but little less than a corporation. For many purposes it is a corporation; a change from one to the other is not so radical as to change materially the rights of the partners. Their relations to each other may be somewhat changed, but their interests remain the same.

We think therefore that in 1883, when the corporation was formed, Mrs. Burrows and Mrs. White owned together the precise interest in the partnership which they received from Mr. Hall's estate in 1857, and that as between themselves their relative rights were precisely the same as then, without reference to the varying proportions of the personal and real estate owned by the partnership, or to the proportion of the one to the other in 1883.

In 1857 the share of the Hall estate in the personal property of the partnership was valued, as we have seen, at $6,000, and in the real estate at $19,000. This was one eighth of the whole partnership property. When the corporation was formed the whole partnership property that went into it, as we have seen, was valued at $320,000, repre-

sented by three thousand two hundred shares. Of these Mrs. Burrows and Mrs. White took together four hundred shares, representing $40,000, and being one eighth of the whole. Taking the proportions in which they relatively owned the property in 1857, Mrs. Burrows would be entitled absolutely to one third of ninety-six shares, representing the then personal property, and the life use of one third of three hundred and four shares, representing the then real estate— or thirty-two shares absolutely and one hundred and one and a third shares for life; and Mrs. White to sixty-four shares, representing two thirds of the then personal property, and two hundred and two and two thirds shares, as representing two thirds of the then real estate, with a right upon the death of Mrs. Burrows to the shares which she takes for her life. And this is precisely the division of the stock made by the court below.

Other questions were made, some upon the pleadings, and some upon the rulings of the court in receiving and rejecting testimony, but it does not seem to us that they materially affect the merits of the case, and we have not deemed it necessary to consider them, as the views we have expressed render them immaterial.

We find no error in the judgment appealed from.

In this opinion ANDREWS, C. J., LOOMIS and BEARDSLEY, Js., concurred.

PARDEE, J., (dissenting.) Frederick Hall devised to his widow the use of one third of his real estate for life; the remainder over, together with the two other thirds, to his daughter absolutely. He bequeathed to his widow one third of his personal estate absolutely; to his daughter two thirds absolutely. The real estate was a stone quarry; the portion of the personal estate with which we are concerned consisted of carts, teams and tools necessary for the working of the quarry.

This property, real and personal, was by contract subject to the control of a majority of the partners associated with

himself in the quarrying business. It is not necessary to consider any questions as to the right either of the widow or of the daughter to withdraw her share of the estate from such partnership and management and have her own in severalty and under her sole individual control, for this reason, that each waived all possible rights of this nature, and during a quarter of a century subjected her estate to the hazards of a continuing partnership; and, being of legal capacity, repeatedly ratified and confirmed all acts of the managers.

Neither it is necessary to determine the precise measure of the right of the widow, under her devise, to exhaust the quarry by her life use; or of the daughter to compel the purchase, from profits, of new quarry land in order to continue the business; or of the right of the widow to any portion of the profit from quarrying in land bought subsequently to the testator's death, for this reason, that the widow and the daughter agreed each with the other to permit the estate which they represented to remain a member of the partnership; that the managers might replace worn out teams, carts and tools, and make purchases of quarry land necessary to the continuance of the business, from the profits, at their discretion; and that they might mingle indistinguishably profits from working newly purchased land, with profits from working lands held at the death of the testator; that the widow might receive some portion of the profits from newly opened quarries, and the daughter some portion of the profits from working the portion of the quarry subjected to the life use of the widow; and during a quarter of a century each received without objection and in accordance with this agreement her proportion of the profits from all quarries; and, being of legal capacity, each ratified and confirmed her contract with the other.

It seems to me to follow from this that when the business ceased to be managed as a partnership, and began to be managed as that of a corporation, the widow owned absolutely one twenty-fourth of the personal property of the partnership, and the right to use for life one twenty-fourth of the realty; this, by the agreement between herself and

the daughter. It is found also that each agreed with the other that the same measure of ownership in each in the partnership should continue in the corporation; that is, between themselves neither should gain nor lose by the substitution of corporate for partnership form; that the shares of stock representing the estate of Frederick Hall should be so divided between them as to preserve to each of them precisely the same right in character and quantity which each had in the partnership.

Therefore the widow is entitled to such shares absolutely as will represent one twenty-fourth part of the personal property, carried from the partnership into the corporation. But the value of this personal property is unknown; the proportion of personal to real in the capital of the corporation is unknown; and in the absence of this knowledge it is impossible to assign a given number of shares to the widow as measuring her absolute ownership of personalty, without risk of doing injustice either to her or to the daughter.

The widow and daughter agreed, each with the other, that the capital stock of the corporation should be divided into thirty-two hundred shares, and that four hundred shares should represent the estate of Frederick Hall.

This, as between that estate on one side, and all of the other shareholders on the other. As between themselves only, they agreed that the four hundred shares should be so allotted as that the kind and proportion of property which each had in the partnership should be continued to her in kind and proportion in the corporation. As between the estate of Frederick Hall on one side, and the other stockholders on the other, it was not a matter of the least importance to know the value of the entire property or of either kind of property. The capital might as well have been a million as less; each owned one eighth of it; each would have one eighth of the shares, whatever the number.

The agreement between the widow and daughter that four hundred shares should represent their aggregate ownership was not intended to, and in no wise does, affect their

agreement to preserve to and for each her proper portion of the four hundred in kind and quantity.

For this last special division it remains necessary to know the value of the realty which went into the corporation; the value of the personalty and the difference, if there be any, between the real values and the amount assumed as the capital. Then the actual value of the personal and of the real property going into each of the four hundred shares, will be known; and to each of the contestants, upon computation, can be assigned the proportion of the four hundred, which will accurately measure her kind and proportion of ownership.