## HIRAM R. MILLS, ADMINISTRATOR, *vs.* CHARLES P. BRITTON.

First Judicial District, Hartford, January Term, 1894. ANDREWS, C. J., CARPENTER, TORRANCE, FENN and BALDWIN, Js.

*P*, the plaintiff's testator, who died in 1849, bequeathed to his wife " all dividends or interest that may accrue or arise " from twenty shares of the preferred, eight per cent cumulative and guaranteed stock of the Housatonic Railroad Company, and from six shares of the common stock of said company, " so long as she shall remain my widow," with remainder to two grandchildren named. The company neither declared nor paid dividends on the preferred or common stock for a number of years (with the exception of an occasional dividend on the preferred stock), and in 1887 the amount of eight per cent guaranteed dividends remaining unpaid on the preferred stock was, together with interest, $320.11 per share. Under these circumstances, the railroad company, in October, 1887, at a stockholders' meeting, duly warned and held, claiming to act under legislative authority given the company in 1879, to settle or compromise with its preferred stockholders for unpaid divi-dends, by funding said claims or by the issue of additional preferred stock, and to take up and cancel any shares of the common stock, either by purchase or exchange for additional stock or bonds author-ized to be issued by the company, voted to increase its stock from 11,800 shares to an amount not exceeding 30,000 shares, and to give each preferred stockholder two of the new four per cent non-cumulative preferred shares, and one hundred dollars in cash or bonds at par at

the option of the directors, in exchange for each share of the eight per cent preférred and guaranteed stock; and to give each common stockholder one share of the new four per cent non-cumulative preferred stock in exchange for each three shares of the common stock. The testator's widow, who was also the executrix of his will, surrendered said twenty-six shares and received from the company two certificates in her name as executrix, one for forty shares and one for two shares of the new stock and $2,000 in cash. Shortly thereafter she transferred twenty of the forty shares to her individual account, and took a new certificate therefor in her own name. This last mentioned stock was subsequently transferred to the account of a firm in New York of which the defendant was a partner, and was received and credited by him on an account he had against the widow. The other twenty-two shares were, at the time this suit was brought, outstanding in the name of the widow as executrix, though the defendant had the custody of the certificates and claimed that the stock belonged to the estate of the widow, recently deceased, and that he had no interest therein except as a creditor of her estate. The plaintiff, who is the administrator with the will annexed on the estate of *P*, made due demand upon the defendant for the entire forty-two shares of stock, and upon the refusal of the defendant brought this action. The defendant had seen a copy of *P's* will, and had read the provisions therein contained respecting the widow's interest in the stock bequeathed by *P*. The plaintiff presented to the commissioners on the insolvent estate of the widow the same claim upon which this suit is based and such claim was allowed; but an appeal was taken which is still pending. *Held:*—

1. The rule is very generally accepted and applied that cash dividends declared by a corporation go to the life tenant, while stock dividends go to the capital of the fund.
2. That in the exchange of stock the railroad company gave no consideration to the respective rights and interests of the life tenant and remaindermen, and did not attempt or intend to define or adjust the rights of either.
3. That the new stock was properly issued and the money properly paid to the widow as executrix.
4. That even if it were true, as claimed by the defendant, that the railroad company, in issuing the additional or new stock, treated and intended to treat the widow as a creditor rather than as a stockholder, yet the transaction, however called, was in legal effect a mere declaration of a stock, as distinguished from a cash, dividend.
5. That if the railroad company was indebted to the widow for unpaid dividends guaranteed, it could not pay such debt by depriving the remaindermen of a part of their principal fund in order to add to the interest fund to which the life tenant, the widow, was entitled.
6. That as between a corporation and creditors not stockholders, the issue of new stock in payment of indebtedness from the corporation to such creditors cannot be called in any sense a dividend, since the removal

or discharge of such indebtedness would add proportionately to the corporation's assets.

7. That a mere increase in the number of shares of capital stock, without any increase in its assets from payments or accumulated earnings, is not a division of anything, either as profits, dividends, income, or interest.

8. That it was unnecessary to determine whether the Act of 1870 was operative in 1887, when the railroad company made this exchange, or whether, if so, the company complied with its terms; since the Act in nowise authorized any interference with, or change of, the terms of the eight per cent guaranteed stock.

9. That the defendant could not be regarded as a bonâ fide purchaser for value, but was affected by such equities as existed between the widow, as life tenant, and the remaindermen.

10. That the plaintiff had the right to consider the twenty shares transferred by the widow to the defendant as unadministered property belonging to the estate he represented; and that the defendant's refusal to surrender it on demand, together with his own claim of title, constituted a conversion.

11. That the defendant's refusal to surrender the twenty-two shares of stock upon the ground and for the reasons stated by him, was not such an absolute and unqualified refusal as to make him liable for a conversion of such stock; and that to this extent the judgment of the trial court was erroneous.

[Argued January 3d—decided February 8th, 1894.]

ACTION to recover the value of forty-two shares of the capital stock of the Housatonic Railroad Company, alleged to have been converted by the defendant; brought to the Superior Court in Hartford County, and tried to the court, *Robinson, J.*, upon an agreed statement of facts ; judgment for the plaintiff and appeal by the defendant for alleged errors of the court. *Judgment sustained in part and reversed in part.*

The case is sufficiently stated in the opinion.

*Adolph L. Pincoffs* of New York, for the appellant (defendant).

I. The twenty additional shares of four per cent stock, for the conversion of which Mr. Britton, the defendant, is sought to be held liable in this action, were issued by the Housatonic Railroad Company in payment of claims based on the non-payment of dividends on the old stock, which claims be-

longed to Mrs. Almira L. Perry, and the title in this stock therefore vested in Mrs. Perry individually.

The reading of the resolutions adopted, especially taken in connection with the Act under which the increase of capital stock was made, will show that this view is the only possible one to take. The resolutions recite " that claims to the total amount of $3,777,356.24 are pressed against this company, for back or unpaid dividends, which claims it is for the interest of this company to compromise and settle." They also expressly admit, in the fifth resolution, " that such claims are a valid, local and subsisting liability and indebtedness of the company, to an amount equal at least to the par value of the bonds to be issued ($100 for each share of $100) and additional preferred stock in these resolutions authorized to be issued (namely, " one additional share for each share of the old stock)." It is therefore apparent that, as far as the intention of the corporation goes, Mrs. Perry, who was entitled to the outstanding claims against the corporation, was entitled to the stock.

II. In considering the rights between life tenant and remainderman, the intention of the corporation in making the settlement is to be controlling in the absence of fraud or collusion. *Gibbons* v. *Mahon*, 136 U. S., 549, 558; *Daland* v. *Williams*, 101 Mass., 571; *Rand* v. *Hubbell*, 115 id., 461; *Ellis* v. *Barfield*, 64 Law Times, 625.

III. The company had a perfect right to pay the additional preferred stock to Mrs. Perry. Our adversary claims that, while it is left to the discretion of the company to distribute its earnings either in cash to the life tenant or to the remainderman, as a stock dividend, as it deems fit, because the life tenant has no vested right in such earnings before a dividend is actually declared, every stock dividend, irrespective of the purpose for which it is declared must belong to the remainderman. This contention cannot be sustained. *Gibbons* v. *Mahon*, 136 U. S., 557.

IV. The issue of the additional preferred stock to any one but Mrs. Perry would have been invalid, and in violation of the law. Not only, however, had the company the right

to issue this stock, so as to give a good title to Mrs. Perry, but any stock issued for a different purpose would have been invalid. The Act of 1870 is not only of importance as showing the intention of the corporation, but it is important because it shows the only source from which the company had a right to issue this stock.

V. Even if the company could not, against the objection of the remainderman, have issued the stock to Mrs. Perry, the plaintiff cannot succeed in the recovery of the twenty shares of stock. The remedy of the plaintiff would have been to prevent the consummation of the settlement by which the additional stock was issued. Not having done so he cannot now ratify one part of the agreement and disaffirm the other. If he claims that the stock is valid stock, he is bound by the way in which it was issued, and, as issued, it belonged to Mrs. Perry. At all events no injury has been done to the plaintiff by the transactions considered in this suit.

VI. The defendant cannot be affected by any equities existing between Mrs. Perry and the plaintiff. *Peck* v. *Providence Gas Co.*, 17 R. I. 275.

VII. By making the claim for the value of the stock delivered by Mrs. Perry as executrix against her estate, the plaintiff has lost the right to hold this defendant liable for a conversion of such stock. This defendant was a party to the proceedings in the Probate Court in which the claim was made against Mrs. Perry's estate for the conversion of the 22 shares of stock. As against him, therefore, the plaintiff has elected to consider the shares as part of Mrs. Perry's estate, and, while this defendant does not claim any right or title in his own right in such shares, it would be unjust to compel him to pay for their value or deliver the shares in a proceeding to which the executor of Mrs. Perry is not a party.

*Hiram R. Mills*, with whom was *Franklin Chamberlin*, for the appellee (plaintiff).

I. In making the exchange of its stock there was no distinction made by the railroad company between life tenant

and remainderman, nor any attempt to define the rights of either in the new stock. There is no provision for sale of any of this new stock nor for putting in any new money to make an increased capital; but it is plain that this action, so far as the stock was concerned, was a readjustment of assets of the company, which had already been capitalized, rather than a division of anything as profits or dividends.

The railroad company had neither right, power, nor authority to make an adjustment between life tenant and remainderman such as is claimed.

In the present case the corporation had *no earnings* to distribute. The claimant of dividends is bound in this case, and always, to show actual earnings to the amount claimed; and further that the directors had acted fraudulently in expending such earnings in additions to the plant. In the emergencies of the business of the company its accumulations, above dividends paid, had been expended and invested. At the time of this exchange no new money was put into its capital by the sale of its shares or otherwise; *its capital* was not increased, but the *number of shares* by which its capital was represented were nearly doubled; it was reduced from an 8 per cent to a 4 per cent stock, and from a cumulative to a non-cumulative stock; and holders of each share of old 8 per cent cumulative stock were asked to exchange for two shares of new 4 per cent non-cumulative stock and were offered also $100 in bonds of the company, or the same amount, in cash, if preferred. The old stock of the testator cannot be diluted to make new stock to distribute to the life tenant. The life tenant and the remainderman are bound, in the absence of fraud, by the action of the corporation *as to earnings*, but not as to the capital.

II. The new shares of 4 per cent preferred new stock were all part of the principal of the fund, and belonged to the remainderman and not to the tenant for life. It is a general and practically uniform rule that *cash* dividends go to the life tenant, and *stock* dividends to the capital of the fund. *Spooner* v. *Phillips*, 62 Conn., 62; *Hotchkiss* v. *Brainerd Quarry Co.*, 58 Conn., 120; *Brinley* v. *Grou*, 50 Conn.,

66; *Minot* v. *Paine*, 99 Mass., 101; *Daland* v. *Williams*, 101 Mass., 571; *Gibbons* v. *Mahon*, 136 U. S., 549; *Barton's Trust*, L. R., 5 Eq., 238–243. "A stock dividend does not distribute property, but simply *dilutes* the shares as they existed before." 93 N. Y., 162, 189. Quoted by Judge GRAY, 136 U. S., 566. *Sproul* v. *Bouch*, 29 Ch. Div., 632; *Bouch* v. *Sproul*, 12 App. Cases, 385.

III. The 22 shares standing in the name of Almira L. Perry, executrix of the will of Nathaniel P. Perry, are not claimed to be income, and defendant cannot justify his refusal to deliver the certificate to the plaintiff.

IV. This is an action in tort; and the liability of the tort-feasors for the conversion alleged is several as well as joint. "A judgment against one of two trespassers without satisfaction is not a bar to an action against his co-trespassers." *Sheldon* v. *Kibbe*, 3 Conn., 214. "A judgment in trover without satisfaction does not pass the title of the property to the defendant." *Atwater* v. *Tupper*, 45 Conn., 144. The allowance of this claim by commissioners of an insolvent estate can certainly have no higher effect in this respect than a judgment. The defendant ought not to be heard to complain because we sought to reduce his obligations by an amount sought to be secured from the other tort-feasor.

FENN, J. Nathaniel P. Perry, of Kent, in this state, died in 1849, then being the owner of twenty shares of the preferred stock of the Housatonic Railroad Co., which was known as eight per cent cumulative stock; so called because the company guaranteed to its holders dividends from profits earned, at the rate of eight per cent per annum, before the common stock could participate in any division of earnings; he also was the owner of six shares of the common stock of said company. By his will he gave to his wife, Almira L. Perry, so long as she should remain his widow, all dividends or interest that might accrue or arise from said shares of stock, with remainder to two grandchildren named. He also appointed his wife executrix of his will. She accepted the trust and remained such executrix, and also the widow of the

testator, until her death, February 1st, 1890. On February 6th, 1888, she surrendered the said twenty shares of preferred stock, and on February 16th, 1888, a new certificate for forty shares of new four per cent non-cumulative preferred stock, in the name of Almira L. Perry executrix, was issued by said railroad company. For the six shares of the common stock, likewise surrendered, there was also issued a certificate for two shares of the new four per cent non-cumulative stock, in the name of Almira L. Perry executrix of N. P. Perry.

On March 3d, 1888, there was transferred from Almira L. Perry executrix, to the individual account of Almira L. Perry, twenty shares of said new preferred stock, and a new certificate for twenty shares of said new preferred stock was issued in the individual name of said Almira L. Perry. On January 29th, 1890, said twenty shares of new preferred stock were transferred to the account of a firm of which defendant was a partner, and were received by the defendant, and there was credited by him, upon an account which he had against said Almira L. Perry, the sum of $980, as the proceeds thereof. The other twenty-two shares of said new four per cent non-cumulative stock are now outstanding in the name of Almira L. Perry, executrix. Said stock is in the custody of the defendant, and is claimed by him to form a portion of the estate of Almira L. Perry, in which he, the defendant, has not and does not claim any interest, except as a creditor of said estate.

On February 25th, 1891, the plaintiff, who is the administrator *de bonis non* on the estate of Nathaniel P. Perry, made due demand upon the defendant for the entire forty-two shares of stock. The defendant has not complied with said demand, or any part thereof.

Upon these, and the other facts which will be stated hereafter in their proper connection, the plaintiff having in the Superior Court recovered judgment for the value of all the shares, the defendant, by his appeal, in effect contests the correctness of that judgment; *first*, as to the twenty shares transferred to the individual name of Almira L. Perry, claim-

ing that they represent " dividends or interest," and belonged to the life tenant, and are not a part of the principal of the trust fund, which belongs to the remainder interest; and *second*, as to the twenty-two shares which are admitted to be principal, claiming that the certificates for these shares are, as against the plaintiff, lawfully held by the defendant, and that said shares have never been converted by him.

We will consider these claims in the above order. As to the twenty shares, there is no dispute concerning the existence of a general and practically uniform rule that cash dividends declared by a corporation go to the life tenant, and stock dividends to the capital of the fund. The law upon this subject has been so clearly and fully stated in recent cases in our own jurisdiction that neither discussion, nor the citation of authorities elsewhere is required. *Terry* v. *Eagle Lock Co.*, 47 Conn., 141; *Brinley* v. *Grou*, 50 Conn., 66; *Hotchkiss* v. *Brainerd Quarry Co.*, 58 Conn., 120; *Spooner* v. *Phillips*, 62 Conn., 62.

But it is the contention of the defendant that these shares of stock were issued, not as dividends, but in payment of claims based on the nonpayment of dividends on the old guaranteed stock, which claims belonged to the life tenant, and that therefore the title to the stock in question vested in such life tenant; that in deciding whether this be so, and in considering the respective rights of life tenant and remainderman, the intention of the corporation in making the settlement is, in the absence of fraud or collusion, of controlling weight; that such company had a perfect right to pay the additional preferred stock to Mrs. Perry, and that the issue to any one else would have been invalid, and in violation of law.

In order to understand this position it will be necessary to look further into the record. It has already been stated that the Housatonic Railroad Co. guaranteed to the holders of its cumulative preferred stock, dividends from profits earned, at the rate of eight per cent per annum, before the common stock could participate in any division of earnings. No dividends or interest were declared or paid on the com-

mon stock since 1850. Dividends on the preferred stock were irregular, so that the dividends guaranteed as aforesaid, of eight per cent remaining unpaid on the original twenty shares of preferred stock, amounted in November, 1887, without interest, to the sum of $2,380; and upon the whole outstanding preferred stock of the company, at this date, November, 1887, the aggregate claims for such dividends of eight per cent, with interest, unpaid by the company and undivided prior to the stockholders' meeting hereafter referred to, amounted to the sum of $3,777,366.24; being $320.11 on each share.

The General Assembly of this State, at its May session, 1870, passed a resolution which authorized and empowered the directors of the Housatonic Railroad Company " to settle or compromise with the holders of the preferred or guaranteed capital stock of said company, for any and all claims which they may have for or on account of the back and unpaid dividends upon said stock, either by funding said claims, or by the issue of additional preferred stock therefor, and upon such terms and conditions as may be agreed upon by the holders of both the original and preferred stock, at a special meeting of such stockholders called for that purpose." Other provisions are contained in said resolution which are unnecessary to quote. This resolution was accepted by the company as an amendment to, and part of its charter, in November, 1870. No further action appears to have been taken by said company in regard to such resolution, or the matters contained therein, until September 6th, 1887. On that day notice was given of a special meeting of the original and preferred stockholders, to be held October 5th, 1887, "for the purpose of making a settlement and exchange with the stockholders as, and in any manner, authorized and contemplated by the Act or Resolution of the General Assembly of the State of Connecticut, passed at its May session, 1870; " also for the transaction of certain other specified business.

From the minutes of said meeting, duly held, pursuant to such notice, October 5th, 1887, it appears that:—" The chairman stated, generally, the purposes of the meeting, explained

the long pending claims of the preferred stockholders for back or unpaid dividends, which amounted by a statement he exhibited to $3,777,366.24, and enlarged on the advantage and desirability of adjusting the same, to remove the cloud over the company, avoid litigation, settle a just debt, and place the company's affairs in a definite shape." Thereupon a preamble and resolution were offered. The preamble stated, among other things, that it was necessary to make provision for the payment of a portion of the funded debt of the corporation soon falling due ; that the holders of the preferred or guaranteed stock, had, and were pressing claims against the company for back or unpaid dividends on such stock, which claims it was for the interest of the company to compromise and settle ; that it was also to the interest of the corporation to secure a reduction of the preferred or guaranteed dividends on such stock, henceforth, from eight per centum per annum, to four per centum per annum and a relinquishment of the cumulative provisions thereof ; that the growth of the business of the company, and its enlarged connections, required an increase of the plant, equipments, and transportation facilities, and that it was also desirable for the company to raise funds for its general business and purposes, and to discharge other obligations. And the resolutions provided *first*, for the borrowing of money and the issuance of consolidated mortgage bonds therefor, to an amount not exceeding three million dollars, to be used and sold for the purpose of funding or retiring existing obligations, " paying, settling or compromising the aforesaid claims of preferred stockholders, as hereinafter agreed, and of carrying out such settlement or compromise," and also for other purposes specified. The resolutions then proceeded as follows : " *Resolved*, Second, That for the purpose of effecting and consummating the settlement or compromise hereinafter agreed upon of the claims of the preferred or guaranteed stockholders for back or unpaid dividends, and of effecting or consummating the exchange hereinafter agreed upon with the common stockholders, and pursuant to powers conferred by the act or resolution aforesaid, of July 6th, 1870, the pre-

ferred capital stock of this company be and the same hereby is increased from 11,800 shares to such amount as may be necessary to carry out these resolutions and agreements, but not exceeding thirty thousand shares, but that the rate of dividends preferred thereby shall be four dollars per share per annum, instead of eight dollars per share as heretofore, and such dividends shall not be cumulative, as heretofore; that the holders of said preferred stock shall be entitled to receive, as aforesaid, dividends of four dollars per share in each calendar year before any dividends for such year shall be paid to the holders of common stock; but when the holders of such preferred stock shall receive four dollars per share of such stock during any one calendar year, then the holders of the common stock shall be entitled to receive four dollars per share before any further dividends shall be paid in said calendar year on such preferred stock; and when both classes shall each have received four dollars per share during any one calendar year, any further dividends declared during such year shall be divided *pro rata* between both such classes of stockholders, and, as above declared such dividends shall not be cumulative, and there shall be no accumulation of arrears of such dividends, and such preferred stock may be called four per cent non-cumulative preferred stock."

" *Resolved,* Third, That any and all claims, demands, suits, accountings and liabilities of every kind which the holders of the preferred or guaranteed stock of the Housatonic Railroad Company have or may have against the company to this date for or on account of back or unpaid dividends upon such preferred or guaranteed stock be and the same are hereby settled or compromised, adjusted, released and canceled on the following terms and conditions."

" First: The holders of the existing preferred stock shall surrender their certificates of such stock, and shall receive one share of such new four per cent non-cumulative preferred stock in exchange for each share of such eight per cent cumulative stock so surrendered, and shall also receive first, one hundred dollars par value of such bonds authorized by said Act and by this meeting, with interest thereon from the

date of such surrender, and second, one additional share of such 'new four per cent non-cumulative stock on the settlement herein made ; and all of the same, namely, two shares of such new four per cent non-cumulative preferred stock and one hundred dollars par value of such bonds, with such interest, shall be in full release and settlement of each share of existing eight per cent cumulative preferred stock and of all claims, aforesaid, for back or unpaid dividends thereon, and of the larger. dividends and cumulative provisions of the existing preferred stock."

" Second : That the company, through its board of directors, shall have the right to pay one hundred dollars in cash on each share of such preferred stock so surrendered in lieu and instead of said bonds as above stipulated and provided, if in the judgment of the board it shall be judicious so to do."

" Third : That all further rights to dividends on the existing preferred stock ceases after this day, and the rights and interests of the holders thereof shall be thenceforth such as are conferred or created by such new four per cent non-cumulative preferred stock and no other ; that the board of directors are hereby fully authorized and empowered to add (and at will to alter or annul the same) such penalties and conditions to the foregoing provisions as they may deem best, in respect of all such stockholders as shall not make such actual surrender within ninety days after notice thereof shall be sent by the secretary by mail to their last post office address known to him."

" Fourth : That the common stockholders of the company, in consideration of assenting to this settlement, shall have the right and privilege contained in resolution fourth upon the conditions therein expressed or referred to."

" Fifth : That it is hereby admitted and agreed that such claims are a valid, legal, and subsisting liability and indebtedness of the company to an amount equal at least to the par value of such bonds and additional preferred stock in these resolutions authorized to be issued in consummating any settlement or exchange therein authorized, and that the right of the holders of such preferred stock to vote as here-

tofore, equally with the holders of common stock at all elections and meetings of stockholders is hereby expressly recognized and agreed to."

"*Resolved*, Fourth : That the holders of the original or common stock of this company shall have the right, and they are hereby declared to be entitled to exchange and surrender their shares of common stock for the said. new four per cent non-cumulative preferred stock, upon the basis of one share of said new preferred stock for each three shares of such common or original stock so surrendered and exchanged, and to receive such one share of new four per cent non-cumulative preferred stock for each three shares of common stock so surrendered and exchanged. *Provided*, that such exchange and surrender be made within ninety days from this date ; and *provided, further*, that after the expiration of said ninety days the board of directors shall take up and cancel any of such stock, either by purchase or by exchanging the same for bonds or stock authorized by said act of 1870, and by these resolutions to be issued, only upon such terms and conditions as they may deem best, and as may be agreed to by the owner or owners of such common stock.

"*Resolved*, Fifth : That the board of directors be and they are hereby fully authorized and empowered to issue such four per cent non-cumulative preferred stock for the purpose aforesaid, and to make such exchange, and to cause the certificates of such stock to be prepared and executed in such form and manner as they may deem best, and generally to execute all instruments, and do all acts and things, and make all agreements, which, in their absolute judgment and discretion may be necessary or proper to effectuate the purposes aforesaid, and to carry out the foregoing resolutions, agreements and acts."

The foregoing resolutions were adopted by a practically unanimous vote of stockholders representing both preferred and common stock. And in accordance with the scheme therein provided, Mrs. Perry received the forty-two shares of stock hereinbefore referred to, and in lieu of bonds to that

amount in par value, she also received $2,000, by check of said railroad company, to her order, as executrix, which she appropriated to her own use. No claim to recover this latter amount of the defendant was pressed in the court below, and no evidence was offered to show that it ever came into his possession. It also appears in the agreed statement of facts in the record, that at the time of the above settlement and exchange with the Housatonic Railroad Company, the market value of said preferred stock, together with all accumulated dividends claimed thereon, was $145 per share, and that in 1891 the new four per cent preferred stock had a market value of $56.00 per share.

Upon these facts it is the general claim of the defendant, as we have already seen, that it was the clear intention of the railroad company to issue the twenty shares of additional preferred stock, not as a dividend, but in the payment of an admitted debt; that such intention should govern, and that these shares should be held to belong to Mrs. Perry, the life tenant, as the person entitled to the claim which was intended to be paid by them.

With the facts recited before us, let us examine the claim. In the exchange of the old stock, it is apparent that no consideration was given by the railroad company to the respective rights and interests of life tenants and reversioners or remaindermen, of such stock. Nor was any attempt to define the rights of either in the new stock made or thought of. It is unnecessary to determine whether such company, either by virtue of the resolution or otherwise, had any power or authority to make any such adjustment of such interests, since it is manifest that none was intended. All the new stock issued in lieu of or in addition to the stock, both preferred and common, which had belonged to Nathaniel P. Perry was properly issued, and the money paid to his executrix, leaving the rights of respective claimants to be elsewhere determined.

But if it were to be conceded that such determination should be governed by the intention of the company, if it could be ascertained; that the additional stock, with the

bonds or money, should be in payment, settlement or compromise of the admitted debt of the company for unpaid dividends to its preferred stockholders, how can such intention be made to appear? That this was indeed one of the purposes of the increase, is manifest from the preamble and resolutions recited. But that it was not the only one is also manifest from such preamble and resolutions. It was also "to the interest of this corporation to secure a reduction of the preferred or guaranteed dividends on such stock henceforth, from eight per centum per annum to four per centum per annum, and a relinquishment of the cumulative provisions thereof." And it was also for the interest of holders of common or original stock, which had never paid any dividends, to exchange it for preferred or guaranteed stock, which would pay dividends. Who shall declare,—who can know the extent to which each of these and other purposes, some of which are expressed in the preamble and resolutions, and some though not expressed it is impossible not to comprehend, might have been regarded as valuable, and considerations which actuated the exchange and increase of stock? The meeting had no occasion to specifically pass upon these matters, since it treated with the owners of stock only in bulk.

But if the only object had been what the defendant assumes, what occasion was there to retire the old stock? If we use, for illustration, the example of interest largely in arrears upon a note secured by mortgage upon real estate, the maker of which is irresponsible beyond the security, the surrender of the old note and the substitution of a new one signed by the same maker and secured upon the same property, for twice the amount of the old, but bearing half the former rate of interest, would seem a peculiar transaction, if regarded solely as a mode of payment of such accrued interest. It is equally hard to see how in the case before us, increasing the old preferred stock of the corporation, while at the same time proportionately decreasing its guaranteed earning capacity, adding also to its shares in exchange for common stock, admitted on the same plane of earning capac-

ity, could tend in any measure to the benefit of a life tenant of such stock having a claim for unpaid and undeclared dividends, beyond the extent to which the transaction detracted from the just interest of the remainderman in such corporate stock. The doubling of the shares under such circumstances, and then giving the additional shares to the life tenant, would, in effect, take from the remainderman half his proportionate interest in the capital of the company. If there had been only an increase, and such increase had been based upon earnings which ought to have been declared and paid during the term of the life tenant, it might seem legitimate to do this; but in the present case it nowhere appears that the corporation had any earnings to contribute. On the contrary it does appear that at the time of this exchange the company was obliged to borrow the money required for the compromise, by issuing bonds of the company therefor. There was no increase in capital, either by the paying in of money, or from accumulated earnings, but only an increase of the number of shares by which the capital was represented. No new property was put in. No new stock was to be sold. The issue of new stock was a readjustment of the capitalized assets of the company, adding nothing thereto, and taking nothing therefrom, and was not a division of anything, as profits or dividends, as interest or income.

But suppose there had been profits or net earnings, for which cash dividends should have been declared to the owners of preferred stock in excess of those actually declared and paid; it follows, since even the cash given to the stockholders as part of the exchange had to be borrowed, that these earnings had already been invested. They had been added to the capital, and the effect of the action of the stockholders was to confirm the previous action of the directors and to retain them as such.

But we return to the real argument of the defendant. And granting, for its sake, the first assumption, that the railroad company admitted that the claims of its preferred stockholders against it for undeclared dividends, to the extent of eight per centum per annum, constituted a " valid,

legal, and subsisting liability and indebtedness of the company to an amount equal at least to the par value of such bonds and additional preferred stock;" and that it was the intention of the company that the additional stock, as well as bonds, should be issued only for the payment of such claims; and thus to distinguish between the rights of the holder of the original preferred stock, as stockholder and as creditor:—it seems to us that granting this, though for argument's sake merely, the conclusion is in no wise altered. Calling these claims debts, the fact remains that they are due to stockholders, and not to outside parties, and are for undeclared as well as unpaid dividends. If calling them debts implies that the earnings of the company warranted their declaration and payment in cash, and that not having been paid in cash it was the purpose of the action taken to pay them partly in bonds, or their avails, and partly by the issue of stock, then, so far forth as such issue of stock is concerned, by whatever name the transaction may be christened, it is in effect the declaration of a stock dividend, in place of a cash one. It takes nothing out of the corporation, as a cash dividend does, but leaves everything in it capitalized, as a stock dividend does. As between a corporation and its stockholders, it matters little what name may be given to such a transaction, or how it may be considered; whether a payment of indebtedness or declaration of a dividend. As between the corporation and persons not stockholders, to whom it was indebted, and whose claims are thus to be liquidated, the issue of new stock is in no sense a dividend. It does more than dilute the shares as they existed before. By taking away indebtedness, the transaction adds proportionately to the assets of the corporation. Such an adjustment, if fair, detracts nothing from the value of the original shares, because it returns a just equivalent for the increase. But, when a question with which the corporation, as such, is not concerned, arises between the owner of income and that of capital, the case is altered. If the corporation is indebted to the shareholder, plainly the remainderman is not indebted to the life tenant; and if the corporation may pay its debts

to such shareholder, as plainly it may not take away from the principal of the fund, which belongs to one, in order that it may be added to the interest of the fund to which another is entitled. Whether it was the intention therefore of the railroad company that these additional shares should be issued to the original stockholders as payment for indebtedness or not, it was not and could not legally have been the intention that such issue should waste the principal in order to increase, or even to preserve the income. Such, however, as we have seen, would be the necessary effect if these new shares were held to be the property of the life tenant.

The defendant says in his brief:—" It was for the interest of the stockholders to consent to a change which would give them, in place of an eight per cent cumulative stock, on which the interest had been paid only at very irregular intervals, a four per cent stock on which it was evidently expected that interest would be paid with regularity." But the defendant in that connection, does not quite go to the extent of asserting that such speculative interest in an increase would have constituted a controlling consideration in inducing a remainderman to accept one share of four per cent, which could only be paid provided the net earnings of the road were eight per cent upon its previous stock, in place of one share of such eight per cent which must be paid, if all the earnings would permit, and if not would constitute, at least in the eyes of the stockholders passing in their meeting upon their own claims, an indebtedness.

It appears to us, however this question may be looked at, the plain principles declared in repeated decisions in reference to the respective rights of remaindermen and life tenants, in case of increase of capital shares of corporate stock, underlie and control the decision which should be reached. Thus, referring to cases in our own jurisdiction, in *Brinley* v. *Grou, supra,* the words used in creating the life interest were "rents, dividends, increase and income," being somewhat broader terms than in Mr. Perry's will. But this court held that an increase of capital from three to four millions, with an apportionment of new shares *pro rata* among the

stockholders of a corporation, at $100 per share, bringing the new stock at once to such a large premium that the trustees, who had been entitled to subscribe for eighty-one shares sold the right to subscribe for thirty-four shares for a sum which enabled them to subscribe and pay for forty-seven shares, gave nothing to the life tenants; but that the right to subscribe for the new shares, the profit on the sale of the right, and the new shares taken, all went to the trustees as a part of the principal of the fund. This court, in answering the questions asked by the trustees, said:—" A shareholder has no proprietary interest in the accumulated profits properly retained by a corporation for the protection of its capital; he cannot acquire one by summoning it to make a rest in its business and take an account of them; he first obtains one when it has either in fact, form, or intent, set his proportion thereof to his individual credit. This, of course, is the measure of the right of a life tenant; there is to him only a possibility that the profits may be divided, or that the use of them by the corporation may increase its dividend during his term." So also, in *Hotchkiss* v. *Brainerd Quarry Co.*, *supra*, this court quotes with approval the language of WOOD, V. C., *In re Barton's Trust*, 5 L. R. Eq. Cases, 238:—" The dividend to which a tenant for life is entitled is the dividend which the company chooses to declare. And when the company meet and say they will not declare a dividend, but will carry over some portion of the half year's earnings to the capital account, and turn it into capital, it is competent for them, I apprehend, to do so; and when this is done everybody is bound by it, and the tenant for life of those shares cannot complain." Again, in the very recent case of *Spooner* v. *Phillips*, *supra*, the subject is exhaustively discussed, with abundant citation of authority, and it is declared as settled : First, that the word " dividends," if unqualified, signifies dividends payable in money; that the word "income" has a broader meaning, but not broad enough to include anything not separated in some way from the principal; that accumulated surplus, so long as it is retained by the corporation, either as surplus or increased stock, can in no proper sense be called

income; second, that a corporation owns the undivided earnings of the business, rather than the stockholders, and the latter cannot become the separate owners of any part of the common property until set apart by the management for that purpose, by declaring a dividend or otherwise.

Among the many cases cited in the opinion is that of *Gibbons* v. *Mahon*, 136 U. S., 549, the original case being reported with extended note in 54 Am. Rep., 262, a most instructive and exceedingly pertinent case, in which the conclusion stated is this :—" Reserved and accumulated earnings, so long as they are held and invested by the corporation, being part of its corporate property, it follows that the interest therein, represented by each share, is capital, and not income, of that share, as between tenant for life and the remainderman, legal or equitable, thereof." And again it was said :—" A dividend is something with which a .corporation parts, but it parted with nothing in issuing this new stock." See also, *Minot* v. *Paine*, 99 Mass., 101 ; 96 Am. Dec. 705, with note ; *Rand* v. *Hubbell*, 115 Mass., 461.

The defendant, however, further contends that the issue of the additional preferred stock to any one but the life tenant would have been invalid and in violation of law. It is said that the Resolution of 1870 is the sole authority for this issue ; that by virtue of that enactment stock could only be issued for the purposes of payment of existing claims, and the conversion of the common stock into preferred stock ; that, therefore, this action is an attempt to claim for the remainderman stock which was not intended to be issued to him by the company, and which, if issued to him by the company, would have been absolutely void in his hands. In answer to this it is unnecessary to consider whether the Act of 1870 was in existence at all in 1887, or whether, as contended by the plaintiff, it had been repealed by subsequent legislation in 1878. Nor is it necessary to determine whether, if such Act was in existence when it provided for the issue of bonds or stock in settlement of claims, it was followed when both bonds and stock were issued in such settlement. It is unnecessary, we say, to decide these matters, since, if

the defendant's contention as to both were conceded, the Act in no wise authorized any interference with, or change of, the terms of the eight per cent guaranteed stock. Nor have those who are entitled to the remainder in this stock in any way assented to its surrender. If, therefore, such issue of new stock is only valid because authorized by the Act of 1870, and only to the extent and for the purposes therein prescribed, it follows that the rights of the holders of the old preferred stock to their capital cannot be affected by such issue. And it is only upon the theory that two new shares, yielding four per cent each, represent one share of the old, yielding eight per cent, that it can be held that such capital would not be affected thereby.

It is further said by the defendant that he stands in the position of a *bonâ fide* holder for value, and that he cannot be affected by any equities existing between Mrs. Perry and the plaintiff. The record, however, states that the defendant had seen a copy of the will of said Nathaniel P. Perry, and had read the provisions therein contained with respect to the interest of Mrs. Perry in the Housatonic Railroad stock. It also appears that the stock was transferred to him to be applied in part payment of a debt by Mrs. Perry, who was his grandmother, three days before her death. There is nothing whatever in the record to justify the assertion of the defendant that this debt was for the advances made Mrs. Perry upon the faith of her ownership of this stock. It is true that the stock had been transferred from Mrs. Perry's name, as executrix, to her individual name. But the record leaves no room to question the defendant's full knowledge of the source from which this stock was derived, and the trust under which it was held. The defendant therefore stands in the same position, in respect to these shares, as Mrs. Perry stood, and the right of the plaintiff, as administrator *de bonis non*, to maintain this suit against him rests upon the same foundation as that which supported the recovery by the plaintiff in *Mansfield* v. *Lynch*, 59 Conn., 320. In each case, the party exercising the original administration parted with assets of the estate, in a manner which gave the

party receiving them no right to retain them against such administrator. They therefore still remained assets of the estate, which it was the duty of the administrator *de bonis non* to administer. The act of Mrs. Perry in causing a transfer of these shares to her individual name, and the subsequent act of transfer to the defendant's firm, for whatever purpose, and with whatever intent said acts were done, did not divest the estate of Nathaniel P. Perry of its interest in the stock. Pomeroy's Eq. Jur. (2d ed.), §§ 1048, 1052. As against this defendant who asserts his ownership of such stock, although occupying no better position in regard to it than Mrs. Perry did, the plaintiff has the right to consider it unadministered property belonging to the estate which he represents ; and when demand was made by the plaintiff upon the defendant for it and he refused to surrender it, claiming title, with the ability which the transfer of the certificates to his firm gave, to assert such title and to use the stock as his own, such refusal constituted conversion. *Hartford Ice Co.* v. *Greenwoods Co.*, 61 Conn., 166. For these reasons there is no error in the judgment of the court below in awarding damages to the plaintiff for the twenty shares of stock in question.

But to the extent that such judgment also includes damages for the conversion of the remaining twenty-two shares of stock, we think that it is erroneous. It appears from the record that at the time of her death, Mrs. Perry was largely indebted to the defendant, and that her estate was insolvent. Commissioners were appointed upon her estate to whom the defendant presented his claim. The plaintiff also presented to such commissioners the same claim set forth in this present action against the defendant for the conversion of the stock. This claim was allowed, but an appeal was taken from the doings of the commissioners, which is still pending, and no payment or dividend has yet been made upon said claim. At the time of the demand by the plaintiff upon the defendant, the defendant understood that his custody of the twenty-two shares of stock was for and in the behalf of the executor of Mrs. Perry, and he did not claim and has not claimed any interest therein, except as creditor of her estate,

This stock stands in the name of Almira L. Perry, executrix. It does not appear that the certificates have ever been indorsed, so that the defendant could, if he so desired, make any use of the stock for his own benefit. He has never desired to do so, and there is no ground to hold that he has ever converted this stock to his own use, unless, under the circumstances, the demand for, and the refusal to deliver the certificates, constituted such conversion.

It is the further claim of the defendant that he was a party to the proceedings before the commissioners, in which the claim was made against the estate of Mrs. Perry for the conversion of these shares, and that as against him the plaintiff elected to consider these shares as a part of her estate; that this being so, it would be unjust to him to compel him to pay for their value, or to deliver them, in a proceeding in which the executor of Mrs. Perry is not a party. It is the claim of the plaintiff that he has not elected, and that this is not a case in which he is put to any election; that it is an action of tort, in which the liability for the conversion alleged is several as well as joint; that "a judgment against one of two joint trespassers, without satisfaction, is not a bar to an action against his co-trespasser, for the same trespass, and does not pass the title of the property to the defendant." *Sheldon* v. *Kibbe*, 3 Conn., 214; *Atwater* v. *Tupper*, 45 Conn., 144; and that the allowance of this claim by commissioners ought to have no higher effect than a judgment.

It seems to us that this contention does not meet the precise point of the true issue. The question is not whether the defendant would be severally liable for conversion; but whether he has in fact converted this stock by his refusal to deliver it to the plaintiff on demand, as we have herein previously held that he might be considered to have done with the twenty shares of stock. As bearing upon the question, the further inquiry as to the reason or ground of such refusal, is relevant. *Hartford Ice Co.* v. *Greenwoods Co.*, *supra.* The plaintiff's claim for conversion presented to the commissioners on Mrs. Perry's estate was allowed. And though an appeal was taken, he is still pursuing it. If finally allowed,

and a dividend paid upon it, the estate available for the payment of other claims, among them the large one of the defendant, will be thereby so much lessened. And certainly the executor on Mrs. Perry's estate would thereby acquire an interest in this stock for the benefit of the creditors. Upon these circumstances, the refusal of the defendant to deliver the certificates of stock to the plaintiff, while at the same time disclaiming title or interest in the stock himself, except to the extent of his interest as creditor, upon the contingency of such stock becoming assets of the estate of Mrs. Perry, was not such an absolute and unqualified refusal to deliver property to the owner or party entitled to the possession, on demand made, as constituted a conversion of the property. *Hartford Ice Co.* v. *Greenwoods Co., supra.*

There is error in the amount of the judgment rendered, to the extent of the damage awarded for the value of the twenty-two shares, and to that extent it is reversed. And it is affirmed to the extent of the damages for the conversion of the twenty shares.

In this opinion the other judges concurred; except CARPENTER, J., who dissented as to that part of the opinion holding there was error in the judgment below respecting the conversion of the twenty-two shares.